UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ENCOMPASS INDEMNITY COMPANY                                 Plaintiff

v.                                                                       Civil Action No. 3:17-cv-00713-RGJ

PAUL GRAY, *ET AL*.                                                Defendants

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' Motions to Dismiss (the "Motions to Dismiss"). [DE 6; DE 8].[1] The matter is ripe. For the reasons below, the Court will GRANT Defendants' Motions to Dismiss.

### I.    BACKGROUND[2]

Encompass Indemnity Company ("Encompass") issued Paul Gray and Michael Gray (the "Grays") a multiple line policy of insurance (the "Policy"). [*Id.* at 2, ¶ 6]. The Policy includes coverage for "claims or suits" brought for "personal injury" or "bodily injury," but does not cover suits brought for bodily injury "[i]ntended by, or which may reasonably expected to result from, [an] intentional or criminal act" (the "Intentional Act Exclusion"). [*Id.* at 3, ¶ 7].

Renee Hook sued the Grays's son in Indiana state court (the "Indiana suit"). [*Id.* at 4, ¶ 8; DE 18-2, Indiana Compl.]. In the Indiana suit, Ms. Hook alleges that the Grays's son, Liam, negligently shot Ms. Hook's son, Andrew, in the eye with a BB gun. [DE 1 at 4, ¶ 9; DE 18-2 at 273, ¶6]. The Grays "have sought coverage under the Policy for the claims asserted [in the Indiana suit] by Defendant Hook against their son." [*Id.* at 4, ¶ 10]. Encompass filed the Complaint in this Court seeking a "[j]udgment declaring that Encompass has no obligation to provide coverage to

---

[1] The Court ordered the parties to supplement the record about the action in Indiana state court. [DE 17].
[2] The Court considers the allegations set forth in the Complaint. [DE 1].

1

the Grays for the claims asserted in the State Court Litigation under the [P]olicy" because the Intentional Act Exclusion applies to the events in at issue in the Indiana suit. [*Id.* at 5]. The Complaint names the Grays, both individually and as guardians of their son, and Ms. Hook, both individually and as guardian as her son as defendants (collectively, the "Defendants"). [*Id.* at 1].

Ms. Hook moved to dismiss the Complaint, requesting that this Court "decline to exercise discretionary jurisdiction" over the controversy. [DE 6 at 156]. Days later, the Grays made the same request of this Court, relying on the facts and arguments made in Ms. Hook's Motion to Dismiss. [DE 8 at 177]. Encompass responded, [DE 11], and the Grays filed a replied. [DE 14]. Ms. Hook then joined in the Grays's Reply. [DE 15].

The Court ordered supplemental briefing because neither Encompass's Complaint [DE 1], nor any of the other briefing on the motions to dismiss [DE 6, 8, 11, 14, 15], explained or stated what causes of action are pending in Indiana or attach the complaint from that case. The parties filed supplemental briefing attaching the Indiana complaint. [DE 18, 19, 23].

## II. STANDARD

"As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing that the exercise of jurisdiction is proper." *Malone v. Portfolio Recovery Assocs., LLC*, 308 F.R.D. 518, 521 (W.D. Ky. 2015) (citing *Taylor v. KeyCorp*, 680 F.3d 609, 612 (6th Cir. 2012)). When deciding a motion to dismiss, the "Court accepts the allegations in the complaint as true." *Id.*

## III. DISCUSSION

### A. Choice of Law

The parties disagree on whether Indiana or Kentucky law applies to this Court's interpretation of the Policy. [*See* DE 11 at 193; DE 14 at 241–42]. Because the applicable underlying law is relevant to the Court's analysis of the whether to exercise jurisdiction under the

Declaratory Judgment Act, the Court will first address this question. Both parties cite the following section of the Policy in support of their respective positions:

> **WHAT LAW WILL APPLY**
>
> This Segment and Policy Introduction is issued in accordance with the laws of the state in which the **residence premises** is located and covers property or risks principally located in that state. Subject to the following paragraph, the laws of the state in which the **residence premises** is located shall govern any and all claims or disputes in any way related to this Segment or Policy Introduction.
>
> If a covered loss to property, or any other **occurrence** for which coverage applies under this Segment or Policy Introduction happens outside the state in which the **residence premises** is located, claims or disputes regarding that covered loss to property, or any other covered **occurrence** may be governed by the laws of the jurisdiction in which that covered loss to property, or other covered **occurrence** happened, only if the laws of that jurisdiction would apply in the absence of a contractual choice of law provision such as this.

[DE 1-1 at 119–20 (emphasis in original)]. Encompass argues that because the Grays' residence is in Kentucky, the preceding passage "call[s] for Kentucky law to govern [the Policy's] interpretation." [DE 11 at 193]. Defendants argue that "Indiana has an interest in this action because the underlying tort occurred there . . . [and e]ven in a contract action, the state where the tort giving rise to that action occurred has an interest in the outcome of the litigation." [DE 14 at 242].

"The Court begins with an acknowledgment of the fundamental tenet that a federal court acting pursuant to its diversity jurisdiction must apply the choice of law rules of the forum state in which it sits to determine the appropriate law to be applied."[3] *Bearden v. Beeler*, Civil Action No. 3:05CV-86-DW, 2006 WL 1980149, at *2 (W.D. Ky. July 11, 2006) (citing *Klaxon Co. v. Stentor*

---

[3] "The Declaratory Judgment Act does not provide an independent basis for jurisdiction. Rather, it provides courts with discretion to fashion a remedy in cases where federal jurisdiction already exists." *One Beacon Ins. Co. v. Chiusolo*, 295 F. App'x 771, 775 (6th Cir. 2008) (citing *Heydon v. MediaOne of Southeast Mich.*, Inc., 327 F.3d 466 470 (6th Cir. 2003)). The Court has jurisdiction under 28 U.S.C. § 1332, because the parties are diverse and the amount in controversy exceeds $75,000.

*Elec. Manuf. Co.*, 313 U.S. 487 (1941); *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 832, 831 (6th Cir. 2000)). "Where a choice-of-law issue arises in a contract dispute, such as in the present case, the Kentucky Supreme Court twice recently affirmed the applicability of the 'most significant relationship' test articulated in § 188 of the Restatement (Second) of Conflict of Laws (1971)."[4] *Wells Fargo Fin. Leasing, Inc. v. Griffin*, 970 F. Supp. 2d 700, 707–08 (W.D. Ky. 2013) (citing *Schnuerle v. Insight Commc'ns Co.*, 376 S.W.3d 561, 566–67 (Ky. 2012); *Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009)). "Recent decisions by Kentucky's highest court have . . . affirmed the application of § 188's most-significant-relationship test, even where the parties have expressly agreed to have their contractual rights and duties governed by a particular state's laws." *Id.* at 709. Under Kentucky choice of law principles, "[t]he location of the tort is not important in the analysis of which state's law determines the validity of or rights under a contract." *Flint v. Liberty Ins. Co.*,

---

[4] Section 188 of the Restatement, titled "Law Governing in Absence of Effective Choice by the Parties," states:

    (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties . . . .

    (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account . . . to determine the law applicable to an issue include:

      (a) the place of contracting,

      (b) the place of negotiation of the contract,

      (c) the place of performance,

      (d) the location of the subject matter of the contract, and

      (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

613 F. Supp. 2d 899, 902 (E.D. Ky. 2009) (citing *Bonnlander v. Leader Nat'l Ins. Co.*, 949 S.W.2d 618, 620 (Ky. Ct. App. 1996)).

Under the framework of § 188, Kentucky has the most significant relationship to the parties and transactions in the Policy. The Grays, to whom Encompass issued the Policy, resided in Kentucky at the time of its issuance. [*Id.* at 10]. The Policy covers the Grays' residence in Kentucky, two of the Grays's vehicles, presumably kept at their residence in Kentucky, and the Grays themselves, including any "person related to [the Grays] by blood, marriage or adoption who is a resident of [the Grays's] household." [*Id.* at 10–12, 88]. And the Policy was negotiated and placed by an insurance agent in Kentucky. [*Id.* at 10].

In similar cases, Kentucky courts have repeatedly applied the law of the state in which the contract was issued, as opposed to the state in which the tort occurred. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Hodgkiss-Warrick*, 413 S.W.3d 875, 879 (Ky. 2013) ("Here . . . a Pennsylvania resident[] entered into an auto insurance contract in Pennsylvania that makes specific reference to Pennsylvania law and that covers, primarily, the vehicle she registered, garaged, and used exclusively in Pennsylvania. The fortuitous fact that the accident occurred in Kentucky is far outweighed by the significant relationship Pennsylvania has with the parties and the insurance transaction, and so, absent some compelling reason not to apply our general choice-of-law rule, Pennsylvania law should control."); *see also Thaxton v. Allstate Ins. Co.*, NO. 2016-CA-001222-MR, 2018 WL 3005930, at *4 (Ky. Ct. App. June 15, 2018). Kentucky law therefore controls the interpretation of the Policy.[5]

---

[5] Defendants cite two cases to that suggest a different analysis of the § 188 factors is more appropriate. [DE 14 at 242 (citing *Int'l Ins. Co. v. Stonewall Ins. Co.*, 86 F.3d 601, 607–08 (6th Cir. 1996); *Nat'l Union Fire Ins. Co. v. White*, 963 F.2d 148, 151 (6th Cir. 1992))]. These cases are inapplicable, as neither apply the interpretation of the § 188 factors used by Kentucky courts.

B.  **Declaratory Judgment Act**

Under the Declaratory Judgment Act, a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). While the Act authorizes district courts to exercise jurisdiction, it does not mandate or impose a duty to do so. *Bituminous Cas. Corp. v. J & L Lumber Co., Inc.*, 373 F.3d 807, 812 (6th Cir. 2004). The Act confers on the "federal courts unique and substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). In general, courts should only exercise this discretionary jurisdiction when doing so would further the interests of justice or preserve the parties' resources. *Grange Mut. Cas. Co. v. Safeco Ins. Co. of Am.*, 565 F. Supp. 2d 779, 785 (E.D. Ky. 2008) (citing *Panhandle E. Pipe Line Co. v. Mich. Consol. Gas Co.*, 177 F.2d 942, 944 (6th Cir. 1949) ("A doctrine conditioning the exercise of discretion in granting a declaratory judgment that is to be derived from the cases, is that no declaration should be made unless it serves a useful, practical purpose.")).

This court considers five factors (the "*Grand Trunk* factors") to determine whether the exercise of Declaratory Judgment Act jurisdiction is appropriate:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for res judicata; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk W.R.R. Co. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir. 1984) (internal quotation marks omitted). Although the Court must balance the five factors, the Sixth Circuit has never clarified the relative weights of the factors. *Id.* at 563. Instead, "[t]he relative weight of the

6

underlying considerations of efficiency, fairness, and federalism will depend on facts of the case." *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014).

### 1. Whether the declaratory action would settle the controversy and clarify the legal relations.

The first two *Grand Trunk* factors assess "(1) whether the declaratory action would settle the controversy" and "(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue." *Grand Trunk*, 746 F.2d at 326. Because "it is almost always the case that if a declaratory judgment will settle the controversy, . . . it will clarify the legal relations in issue," the inquiries required by these two factors often overlap substantially. *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 397 (6th Cir. 2019) (citing *Flowers*, 513 F.3d at 557; *Bituminous*, 373 F.3d at 814; and *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003)).

"Confounding the analysis of these factors is the Sixth Circuit's acknowledgment that it has created two lines of cases which, at first blush, appear at odds." *United Specialty Ins. Co. v. Cole's Place, Inc.,* 2018 WL 1914731 at 4 (W.D. Ky. 2018) (citing *Flowers*, 513 F. 3d at 555). "One line of cases approved of declaratory actions because they can 'settle the insurance coverage controversy,' while a second line of cases disapproved of declaratory actions because while they 'might clarify the legal relationship between the insurer and the insured, they do not settle the ultimate controversy.'" *Id*. (quoting *Flowers*, 513 F.3d at 555).

The Sixth Circuit explained that this incongruence results from the "different factual scenarios" that each line of cases presents.[6] *Flowers*, 513 F.3d at 557. As to the first factor, one line of cases holds that a declaratory judgment over coverage does "settle the controversy,"

---

[6] Some courts have expressed doubt about the reconcilability of the Sixth Circuit cases. *See, e.g.*, *Grange Mut. Cas. Co.* 565 F. Supp. 2d. at 787.

because it resolves the dispute between the insurer and insured about who will pay for the state-court litigation. *See, e.g.*, *Hoey*, 773 F.3d at 760–61 (acknowledging the split but finding the district court did not abuse its discretion in finding the first factor supported jurisdiction); *Flowers*, 513 F.3d at 556; *Northland*, 327 F.3d at 454; *Allstate Ins. Co. v. Green*, 825 F.2d 1061, 1066 (6th Cir. 1987), *abrogation on other grounds recognized by Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964 (6th Cir. 2000). In the first line of cases, "focusing just on the insurance controversy, a technical or legal issue is often at the heart of the coverage controversy, and to the extent the facts of the underlying case matter, they are undisputed." *Emplrs. Ins. Co. of Wausau v. Duro- Last Roofing, Inc.,* No. 11-10206-BC, 2011 WL 2119360, at *6 (E.D. Mich. Mat 27, 2011).

The second line of cases holds that a declaratory judgment on coverage does not "settle the controversy," where resolving the coverage controversy would require resolution of disputed facts at issue in the underlying case. *Cole's Place, Inc.,* 2018 WL 1914731 at 4 (citing *Emplrs. Ins.*, No. 11-10206-BC, 2011 WL 2119360, at *6). "In other words, a declaratory judgment is proper if it will only have to decide purely legal questions or engage in fact-finding that does not affect the parties in the underlying action." *Argonaut-Midwest Ins. Co. v. Johnson*, No. 3:14-CV-00395-TBR, 2014 WL 6804284, at *2 (W.D. Ky. Dec. 3, 2014) (citations and internal quotation marks omitted).

The second line of cases hold that such a judgment does not "settle the controversy" between all relevant parties where, for instance, the state-court tort plaintiff has not been joined in the declaratory-judgment action. *See, e.g.*, *Travelers Indem. Co. v. Bowling Green Prof'l Assocs., PLC*, 495 F.3d 266, 272 (6th Cir. 2007); *Bituminous*, 373 F.3d at 813–14; *Omaha Prop. & Cas. Ins. Co. v. Johnson*, 923 F.2d 446, 448 (6th Cir. 1991). On that reasoning, a federal declaratory-judgment action does not satisfy the first *Grand Trunk* factor because the ongoing state-court

litigation can reach the same issues, and the insurer can be joined in that litigation or can defend against an indemnity action later brought by the state-court defendant. The latter set of cases has sometimes emphasized the existence of difficult or fact-bound issues of state law awaiting resolution in the state-court litigation. *See Bituminous*, 373 F.3d at 813–14; *Omaha*, 923 F.2d at 447.

The parties agree that the indemnity issue is not before the Indiana state court. [*see* DE 6-1 at 162 ("the underlying litigation in Indiana would not solve the issue of coverage . . . Encompass is not a party to the Indiana tort action against the Grays")]. However, in the Indiana action, which has not yet resolved and is pending trial, Ms. Hook is suing Gray for negligence. [DE 18-2]. Here, in its complaint for declaratory judgment, Encompass seeks a declaration that there is no coverage under the policy based on the intentional act exclusion. As a result, both this case and the Indiana case, require fact-finding on whether Gray's actions were negligent or intentional. Thus some of the same factual issues are before both courts.

Encompass asserts that "the existence coverage in this case turns on whether the admitted, undisputed conduct of Liam Gray constitutes 'intentional or criminal acts" as that term of the Policy is interpreted under Kentucky law." [DE 11 at 190]. Encompass admits that deciding this issue will require factual findings. Yet Encompass argues that the record in the Indiana suit contains sufficient evidence for this Court to find that Liam's shooting of Andrew is intentional as a matter of law under the "inferred intent" doctrine articulated by Kentucky courts. [*Id*. at 190–91]. Encompass then reasons that this Court can thus adjudicate that issue without risking making any factual determinations contrary to one made by the court in the Indiana suit. [*Id*.].

Encompass's argument fails for two reasons. First, the record contains only excerpts from depositions taken in the Indiana suit. [*See* DE 11-1; DE 14-2; DE 14-3]. But a deposition is not a

9

factual determination—assertions in a deposition may be irrelevant to the ultimate factual determination, *see Boals v. Gray*, 775 F.2d 686, 695 (6th Cir. 1985) (holding that it is "improper" for a district court to consider a "deposition [that] was neither stipulated to nor offered in evidence at trial"), or rejected by the finder of fact, *Kimble v. State Farm Fire and Cas. Co.*, 1:12CV00186, 2013 WL 4501023, at *4 (N.D. Ohio Aug. 21, 2013) ("the decision as to what to believe and what to disregard in Plaintiff's deposition testimony is entrusted to the jury at trial"). Because the relevant factual determinations are not yet made in the Indiana suit, this Court cannot know that the fact-finder in this case would not contradict the findings ultimately made by the Indiana court.

Second, the deposition excerpts in the record are insufficient to determine whether Liam's actions "constitute[] 'intentional or criminal acts' as that term of the Policy is interpreted under Kentucky law." [DE 11 at 190]. Generally, Kentucky law uses a "subjective standard" when determining whether an act is excluded by exceptions such as the Intentional Act Exclusion. *Nationwide Mut. Fire Ins. Co. v. James*, Civil Action No. 09–40–EBA, 2011 WL 382221, at *2 (E.D. Ky. Feb. 3, 2011). Under the subjective standard, "the insured must have expected or intended the loss that occurred in order for the exclusion to apply, otherwise the insurance company is obligated to provide a defense." *Id.* at *3 (citing *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 280 (Ky. 1991)). Kentucky courts follow the "inferred intent" rule, however, which permits a district court to infer subjective intent "when the act giving rise to the loss 'is so inherently injurious, or substantially certain to result in some injury, that the intent to injure, or the expectation that injury will result, can be inferred as a matter of law.'" *Id.* (quoting *Thompson v. West Am. Ins. Co.*, 839 S.W.2d 579, 581 (Ky. App. 1992)).

Kentucky courts have applied the inferred intent doctrine to the discharge of firearms; for instance, when a "couple was estranged, their relationship was subject to ongoing strife, [assailant]

10

retrieved a shotgun from the house, and he used it on his wife, the person with whom he was in conflict," the Kentucky Court of Appeals affirmed the district court's inferring that because "[assailant] deliberately pointed a gun at his wife's face, pulled the trigger, and then took the same gun and shot himself," the assailant "acted intentionally" for the purposes of an insurance policy exclusion. *Nationwide Mut. Fire Ins. Co. v. Pelgen*, 241 S.W.3d 814, 818 (Ky. App. 2007).

The facts here are unlike those in which Kentucky courts have applied the inferred intent rule. According to Liam, he and Andrew, who were in high school at the time of shooting, had been "best friends" since "a little bit before kindergarten." [DE 11-1 at 200]. Liam claims that he, Andrew, and two other friends were shooting BB guns outside Andrew's house when Andrew broke off from the group and walked around the house, at which point a mutual friend suggested that he and Liam "just kind of like pretend to scare [Andrew]." [*Id*. at 210–11]. Liam says that Andrew saw them and ran "deeper, farther down the cul-de-sac," and that he decided to "just shoot a shot to scare [Andrew]." [*Id*. at 212]. In Liam's words, "I didn't know the BB gun had like that much power, and since it was just like air, I didn't think it could do nearly as much harm as it did, and just kind of shot one in [Andrew's] vicinity because I couldn't see [Andrew] very well." [*Id.*]. According to Liam, he "meant for the gun to fire, but . . . did not mean to get anywhere close to [Andrew]." [*Id.* at 213]. Liam asserts that before this incident, he had never fired a BB gun before, that he "didn't even realize that a BB could travel that far," and that he "wasn't aiming at [Andrew]." [*Id.* at 214–15].

In his deposition, Andrew stated that the "reason I wasn't worried or anything is because I didn't think that a BB gun could shoot that far, because none us—besides [a mutual friend] maybe, none of us had really been around BB guns. So we didn't know—I didn't know that it could shoot that far." [DE 14-3 at 248–49]. According to Andrew, Liam "was teasing [Liam] by shooting the

11

gun like in my general area, kind of a way of teasing," [*id.* at 250], and that "if I had been in like a slightly different location, regardless of where I was, it could have missed . . . it probably would have missed," [*id.* at 248].

The undisputed facts at this stage are that Liam fired the BB gun while at some distance from Liam, aimed the gun only in Liam's general direction, as opposed to directly at him, and that neither boy believed that the BB would have sufficient velocity to strike Liam. These facts are unlike those in which Kentucky courts have found that an act "is so inherently injurious, or substantially certain to result in some injury, that the intent to injure, or the expectation that injury will result, can be inferred as a matter of law." *James*, 2011 WL 382221 at *3; *see, e.g.*, *Stone v. Ky. Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 812–14 (2000) (applying the inferred-intent doctrine when an assailant "pointed the rifle directly at [the victim] and shot him at close range"); *Coleman v. State Farm Fire and Casualty*, NO. 2015-CA-000350-MR, 2016 WL 4256903, at *2 (Ky. App. Aug. 12, 2016) (applying the inferred-intent doctrine when an assailant "kicked [the victim], pointed a rifle at him at close range, and pulled the trigger"); *Pelgen*, 241 S.W.3d at 818 (applying the inferred-intent doctrine when a husband "pointed a [shotgun] at his wife's face" and "pulled the trigger").

This action would therefore require the trier of fact to determine whether Liam subjectively "expected or intended" to shoot Andrew in the eye. *James*, 2011 WL 382221 at *3. Because the outcome of that determination is unknown, this Court cannot know that the fact-finder in this case would not contradict the findings ultimately made by the Indiana court. In short, allowing this suit to proceed would therefore "require the district court to inquire into matters being developed through state court discovery," thereby introducing a risk of inconsistent findings. *Flowers*, 513 F.3d at 556.

Because there is a risk of inconsistent factual findings, the first two *Grand Trunk* factors counsel against exercising jurisdiction. "Where a pending coercive action, filed by the natural plaintiff, would encompass all the issues in the declaratory judgment action, the policy reasons underlying the creation of the extraordinary remedy of declaratory judgment are not present, and the use of that remedy is unjustified." *AmSouth Bank v. Dale*, 386 F.3d 763, 787 (6th Cir. 2004). The first two *Grand Trunk* factors therefore counsel against exercising jurisdiction.

### 2. Whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for res judicata.

Next, the Court considers "whether the use of the declaratory judgment action is motivated by 'procedural fencing' or [is] likely to create a race for res judicata." *Flowers*, 513 F.3d at 558. This factor "is meant to preclude jurisdiction for 'declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a "natural plaintiff" and who seem to have done so for the purpose of acquiring a favorable forum.'" *Id.* (quoting *AmSouth Bank v. Dale*, 386 F.3d 763, 788 (6th Cir. 2004)). Courts "are reluctant to impute an improper motive to a plaintiff where there is no evidence of such in the record." *Id.* "A district court should not deny jurisdiction to a plaintiff who has not 'done any more than choose the jurisdiction of federal rather than state court, a choice given by Congress.'" *Id.* (quoting *State Farm Fire & Cas. Co. v. Odom*, 799 F.2d 247, 250 n.1 (6th Cir. 1986)). The Sixth Circuit seldom finds procedural fencing if the declaratory-plaintiff filed after the start of state court litigation. *Cole's Place, Inc.*, 936 F.3d at 399. Moreover, if there is no evidence of procedural fencing, the Sixth Circuit typically finds the factor "neutral" in the analysis and not pointing toward denying jurisdiction. *Id.* at *14.

Here, the Indiana suit was filed before this action. [*See* DE 6-1 at 164; DE 11 at 191–92]. "[W]hen the plaintiff has filed his claim after the state court litigation has begun, [the Sixth Circuit] ha[s] generally given the plaintiff 'the benefit of the doubt that no improper motive fueled the

13

filing of [the] action.'" *Id.* (fourth alteration in original) (quoting *Bituminous*, 373 F.3d at 814). The third *Grand Trunk* factor therefore counsels exercising jurisdiction.

> **3. Whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction.**

The fourth *Grand Trunk* factor addresses "whether accepting jurisdiction would increase friction between federal and state courts." *Flowers*, at 559. This factor is divided into three sub-parts:

> (1) whether the underlying factual issues are important to an informed resolution of the case;
>
> (2) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
>
> (3) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common law or statutory law dictates a resolution of the declaratory judgment action.

*Id.* at 560 (citing Bituminous, 373 F.3d at 814–15).

> a. <u>Whether the Underlying Factual Issues are Important to an Informed Resolution of the Case.</u>

The first sub-part "focuses on whether the state court's resolution of the factual issues in the case is necessary for the district court's resolution of the declaratory judgment action." *Flowers*, 513 F.3d at 560. As discussed above, whether Liam Gray's actions were intentional or negligent requires the same findings of fact before the Indiana court. This sub-factor counsels against exercising jurisdiction.

> b. <u>Whether the State Trial Court is in a Better Position to Evaluate Those Factual Issues than is the Federal Court.</u>

The second sub-part examines "which court, federal or state, is in a better position to resolve the issues in the declaratory action." *Id*. Generally, "Kentucky courts are in the better position to apply and interpret its law on these issues." *Travelers Indem. Co. v. Bowling Green*

*Prof'l Assocs, PLC*, 495 F.3d 266, 272 (6th Cir. 2007). *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000). It is also appropriate for courts to consider whether state-court decisions have addressed the issue in question. *Id.* at 968–69; *see also Bituminous*, 373 F3d. at 815. Ruling on an undetermined question of state law may, of course, "increase the friction between our federal and state courts." *Id.* at 968. That said, "[t]his consideration appears to have less force when the state law is clear and when the state court is not considering the issues," such as "when an insurance company '[is] not a party to the state court action, and neither the scope of insurance coverage nor the obligation to defend [is] before the state court . . . a decision by the district court on these issues would not offend principles of comity.'" *Flowers*, 513 F.3d at 560 (quoting *Northland*, 327 F.3d at 454).

The Sixth Circuit has "found that 'issues of insurance contract interpretation are questions of state law with which the Kentucky state courts are more familiar and, therefore, better able to resolve.'" *Id.* (quoting *Travelers*, 495 F.3d at 273). The questions that would arise here do not, however, involve novel issues of Kentucky law. *See Cole's Place, Inc.*, 2018 WL 1914731, at *8. The issues involve the clear application of state law and are currently being considered by a state court; the second sub-factor therefore counsels against exercising jurisdiction, even if less strongly than if the issues involved novel or unsettled questions of state law.

        c.   <u>Whether There is a Close Nexus Between Underlying Factual and Legal Issues and State Law and/or Public Policy, or Whether Federal Common or Statutory Law Dictates a Resolution of the Declaratory-Judgment Action</u>

The third sub-part "focuses on whether the issue in this federal action implicates important state policies and is, thus, more appropriately considered in state court." *Flowers*, 513 F.3d at 561. Kentucky state courts are "more familiar and, therefore, better able to resolve" interpretation of insurance contracts. *Id*. Even when the state law is not difficult to apply, the Sixth Circuit has

15

usually found "that the interpretation of insurance contracts is closely entwined with state public policy." *Cole's Place*, 936 F.3d at 401, citing *e.g.*, *Flowers*, 513 F.3d at 561 and *Travelers*, 495 F.3d at 273. Because this action involves an interpretation of a Kentucky insurance contract, the third sub-factor does not support exercising jurisdiction.

### 4. Whether there is an alternative remedy which is better or more effective.

The final factor asks "whether there is an alternative remedy which is better or more effective" than federal declaratory relief. *Grand Trunk*, 746 F.2d at 326. "[I]f an alternative remedy is better or more effective," the district court should decline to exercise jurisdiction. *Id*. A better alternative may exist where "state law offers a declaratory remedy or if coverage issues can be litigated in state-court indemnity actions." *Cole's Place*, 936 F.3d at 402, citing *Bituminous*, 373 F.3d at 816; and *Travelers*, 495 F.3d at 273. The district court's inquiry on this factor "must be fact specific, involving consideration of the whole package of options available to the federal declaratory plaintiff." *Flowers*, 513 F.3d at 562.

Indiana law provides a declaration of rights procedure in the Indiana Declaratory Judgment Act, I.C. 34–14–1–1 *et seq.*, and the Indiana court "might also have been able to combine the two actions so that all issues could be resolved by the same judge." *Mass. Bay Ins. Co. v. Christian Funeral Dirs., Inc.*, No. 18-5267, 2018 WL 6787945, at *8 (6th Cir. Dec. 26, 2018). "Further, insurers could file an indemnity action at the conclusion of the underlying state action." *Travelers Indem. Co.*, 495 F.3d at 273. Thus, "[t]here is no reason to suppose that the alternate remedies available in state court would not adequately protect [Encompass's] interests." *Bituminous*, 373 F.3d at 816. As a result, "this factor weigh[s] against federal discretionary jurisdiction." *Travelers Indem. Co.*, 495 F.3d at 273.

As each of the three sub-factors weights against exercising jurisdiction, the fourth *Grand Trunk* factor counsels against exercising jurisdiction. That this Court may be marginally better suited to address issues of Kentucky state law does not suggest that allowing the Indiana court to do so would interfere with the orderly and comprehensive disposition of a state court litigation—there is, after all, no Kentucky state court litigation with which to interfere. Exercising jurisdiction, however, would require the parties to re-litigate factual issues already being litigated before the Indiana court, and the fourth *Grand Trunk* factor therefore counsels against exercising jurisdiction.

## 5. Balancing the Grand Trunk factors.

As noted above, the Sixth Circuit has never clarified the relative weight of the factors; instead, "[t]he relative weight of the underlying considerations of efficiency, fairness, and federalism will depend on facts of the case." *Cole's Place*, 936 F.3d at 396, citing *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014). Further,"[t]he essential question is always whether [the court] has taken a good look at the issue and engaged in a reasoned analysis of whether issuing a declaration would be useful and fair." *Id*., citing *Hoey,* 773 F.3d at 759 (citation omitted). Here, however, all but the third *Grand Trunk* factor counsel against exercising jurisdiction. This Court therefore declines to exercise jurisdiction and will GRANT the Motions to Dismiss.

Having evaluated those factors, the Court is persuaded that it would be inappropriate to exercise jurisdiction. The only *Grand Trunk* factor that counsels exercising jurisdiction—whether Encompass is engaging in procedural fencing—"should be afforded little weight in cases where, as here, there is no evidence of procedural fencing." *Mass. Bay*, 2018 WL 6787945, at *6. The other factors all counsel against exercising jurisdiction, mainly because there is currently a court determining the primary issue in this case—Liam's state of mind when he discharged the BB gun—and the parties may bring a declaratory action before that court if they so choose.

### III. CONCLUSION

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** that Defendants' Motions to Dismiss [DE 6; DE 8] are **GRANTED**. This matter is **DISMISSED** and **STRICKEN** from the Court's active docket. The Court will enter a separate Judgment.